## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 09-30047 |
| RADLAX GATEWAY HOTEL, LLC, | ) | (Jointly Administered) |
| et al., | ) | |
| | ) | Hon. Bruce W. Black |
| Debtors. | ) | |

### <u>NOTICE OF MOTION</u>

**PLEASE TAKE NOTICE** that on **Wednesday, June 9, 2010** at **11:00 a.m.**, or as soon thereafter as counsel may be heard, we will appear before the Honorable Bruce W. Black, or any judge sitting in his stead, in Room 615 of the Everett McKinley Dirksen Building, 219 South Dearborn Street, Chicago, Illinois 60604, and present the *Debtors' Motion for an Order: (A) approving procedures for the sale of substantially all of the Debtors' assets; (B) scheduling an auction; (C) approving assumption and assignment procedures; (D) approving form of notice; and (E) granting related relief*, a copy of which is hereby served upon you.

Dated: June 4, 2010

**RADLAX GATEWAY HOTEL, LLC and
RADLAX GATEWAY DECK, LLC**

By:   /s/ Brian A. Audette
      PERKINS COIE LLP
      David M. Neff (ARDC # 6190202)
      Brian A. Audette (ARDC # 6277056)
      Eric E. Walker (ARDC # 6290993)
      131 S. Dearborn Street - Suite 1700
      Chicago, Illinois 60603-5559
      Telephone:  (312) 324-8400
      Facsimile:  (312) 324-9400

*Attorneys for the Debtors*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 09-30047 |
| RADLAX GATEWAY HOTEL, LLC, | ) | (Jointly Administered) |
| et al., | ) | |
| | ) | Hon. Bruce W. Black |
| Debtors. | ) | |

### DEBTORS' MOTION FOR AN ORDER:  (A) APPROVING PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (B) SCHEDULING AN AUCTION; (C) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES; (D) APPROVING FORM OF NOTICE; AND (E) GRANTING RELATED RELIEF

RadLAX Gateway Hotel, LLC ("Gateway Hotel") and RadLAX Gateway Deck, LLC ("Gateway Deck" and together with Gateway Hotel, the "Debtors") hereby move, pursuant to sections 105(a), 1123 and 1129 of title 11 of the United States Code (11 U.S.C. §§ 101 *et seq.*, the "Bankruptcy Code") and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of orders:  (A) approving procedures for the sale of substantially all of the Debtors' assets; (B) scheduling an auction; (C) approving assumption and assignment procedures; (D) approving form of notice; and (E) granting related relief (the "Motion").  In support of this Motion, the Debtors state as follows:

### JURISDICTION AND VENUE

1.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.     Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The statutory bases for the relief requested herein are sections 105, 1123 and 1129 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006.

## BACKGROUND

**A.    Commencement Of The Chapter 11 Cases, The Debtors' Assets And Pre-Petition Financing**

4.    On August 17, 2009 (the "Petition Date"), the Debtors commenced their cases (the "Chapter 11 Cases") by the filing of voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  On August 20, 2009, the Court entered an order directing joint administration of the Debtors' cases under Case No. 09-30047.

5.    Gateway Hotel owns the Radisson Hotel at Los Angeles International Airport (the "Hotel"), which is the closest hotel (within walking distance) to Los Angeles International Airport and has 580 guest rooms, including 180 business-class rooms and 20 suites.  Gateway Deck owns a parcel of real estate adjacent to the Hotel (the "Parking Land" and together with the Hotel, the "Real Property") upon which it had been constructing a parking structure prior to having its funding terminated by its lender before the Petition Date.

6.    In November, 2007, the Debtors obtained a $142,000,000 construction loan (the "Loan") from Amalgamated Bank, as Trustee of the Longview Ultra Construction Loan Investment Fund ("Amalgamated"), in its capacity as administrative agent for itself and San Diego National Bank ("SDNB" and together with Amalgamated, the "Lender") to renovate the Hotel and build a new parking structure upon the Parking Land.  As of the Petition Date, the Debtors owed the Lender in excess of $120,000,000 on account of the Loan.

7.    At the time the Loan was originated, SDNB was owned by FBOP Corporation, an Oak Park, Illinois based bank holding company.  In the third and fourth quarters of 2008, FBOP Corporation was forced to write off the entirety of its nearly $800 million worth of investments of preferred shares in government-sponsored entities Freddie Mac (Federal Home Loan Mortgage Corporation) and Fannie Mae (Federal National Mortgage Association), which FBOP

Corporation had spread out amongst its subsidiary banks, including SDNB, after both of the mortgage companies were seized by the federal government on September 8, 2008. Those investment losses left SDNB critically undercapitalized, which ultimately lead to the seizure of SDNB by the Federal Deposit Insurance Corporation (the "FDIC") and its sale to U.S. Bank National Association ("U.S. Bank").

8.      SDNB is the subject of a certain Purchase and Assumption Agreement among Federal Deposit Insurance Corporation, Receiver of San Diego National Bank, San Diego, CA, U.S. Bank, and the FDIC, which includes a certain Commercial and Other Assets Shared Loss Agreement (together, the "SDNB Agreement"). Pursuant to the SDNB Agreement, (a) U.S. Bank purchased certain of SDNB's loans, including SDNB's interest in or portion of the Loan, and (b) the FDIC must reimburse U.S. Bank for certain losses sustained by U.S. Bank in connection with the Loan.

9.      As contemplated by the Loan and prior to the Petition Date, Gateway Hotel renovated the Hotel over the course of the second half of 2008 and Gateway Deck commenced construction in August, 2008 to build a new eight-level parking structure on the Parking Land. At the time of the Loan origination in November of 2007, the parking structure was anticipated to consist of only seven levels. Soon thereafter Gateway Deck commenced working with the City of Los Angeles to obtain the necessary entitlements to increase the size of the parking structure to eight levels. At all times, Lender was aware of Gateway Deck's efforts to obtain the entitlements from the City of Los Angeles to increase the size of the parking structure and that, if successful, building a larger parking structure would result in an increase to its construction budget (as well as increase in the value of its collateral). Gateway Deck was successful in

obtaining the approval of the City of Los Angeles to construct an eight level parking structure, rather than a seven level structure.

10.      In August of 2008, Gateway Deck began demolishing the old parking structure and immediately upon completion of that demolition began construction of the new eight-level parking structure.  The Lender and its third party construction consultant were provided with the revised construction plans for the larger parking structure and the revised and increased budget for its construction prior to commencement of the demolition and the new construction. Thereafter, Gateway Deck made regular monthly draw requests to the Lender for funds under the Loan to pay for the construction of the parking structure, which draw requests were all reviewed, approved and funded by the Lender until soon after SDNB suffered its losses related to its preferred shares in Freddie Mac and Fannie Mae.

11.      After March of 2009, the Lender abruptly and unjustifiably terminated all funding under the Loan notwithstanding the fact that (a) the Lender had approved additional funding to account for the construction of an additional level to the parking structure, (b) contractors and subcontractors were owed substantial sums of money on account of work performed at the Hotel and upon the Parking Land, (c) the Lender had previously reviewed, approved and funded numerous construction draw requests under the Loan, (d) the Lender had directly encouraged and convinced the major contractors to continue working on the Hotel renovations and the parking structure and that the Lender would continue funding under the Loan in response to those contractors concerns to Gateway Deck and the Lender about funding future draw requests after prior draw requests had been funded late, and (e) Gateway Deck had executed a contract to sell the parking structure upon its completion.  As a direct result of the Lender's improper termination of funding under the Loan after it had promised to provide such funding, numerous

LEGAL18387840.3

parties filed mechanic's liens and commenced lawsuits against the Debtors to enforce their rights under applicable California law, which claims total more than $15,000,000.  Moreover, Gateway Deck has been unable to complete construction of its new parking structure, thereby (x) nullifying Gateway Deck's ability to complete and sell its parking structure to partially repay the Lender, (y) subjecting the Debtors to litigation with LAX Enterprise, LP ("Enterprise"), which claims millions of dollars in damages for the Debtors' alleged continued interference with Enterprise's purported easement for the use of parking spaces upon the Parking Land (the "Enterprise Litigation") and (z) impairing the Hotel's ability to adequately service group business bookings due to the resulting lack of on-site parking and eliminating the Hotel's ability to operate parking operations profitably due to the costs of obtaining off-site parking.

**B.**     **Marketing The Debtors' Business And Assets**

12.     The Debtors retained FBR Capital Markets & Co. ("FBR") as their financial advisors and investment bankers to assist the Debtors with formulating one or more chapter 11 plans.  In or about November, 2009, FBR went to market in an effort to generate interest in and offers for additional equity and/or financing alternatives.  Since that time, interested parties have conducted extensive due diligence and evaluated the Debtors, their businesses, their assets, and their liabilities.  Specifically, FBR targeted more than 80 individuals and entities regarding the Debtors' business and assets (the "Targets").  The Targets consist of private equity, hedge funds, public asset managers, public and private hospitality companies, and opportunity funds, all of which have been verified as possessing available capital and the ability to close one or more transactions without any financing contingencies.   Of those Targets, 30 have executed confidentiality agreements (thereby granting them access to an on-line data room) and the

Debtors' representatives and FBR have had dozens of telephone conferences and/or in person meetings with these Targets.

13.     In connection with these efforts, the Debtors and FBR have procured LAX Century & Sepulveda Hotel, LLC (the "Stalking Horse") as the purchaser for substantially all of the Debtors' assets.  The Stalking Horse's members are anticipated to be Och-Ziff Real Estate Acquisitions LP, or its designee ("OZRE"), which is expected to hold a ninety-five percent (95%) membership interest in the Stalking Horse, and The Harp Group, Inc., or its designee ("Harp"), along with Blue Vista Capital Partners, or its designee ("Blue Vista"), which are together expected to hold a five percent (5%) membership interest in the Stalking Horse.  OZRE is unrelated to the Debtors.  However, Harp's principal and sole shareholder, Peter G. Dumon, is one of the Debtors' principals and decision-makers and Blue Vista is also one of the Debtors' decision makers.  Moreover, the Hotel's current management company, Portfolio LAX, LLC (a wholly owned subsidiary of Portfolio Hotels & Resorts, LLC), will continue to manage the Hotel if the Stalking Horse purchases it.

**C.     The Proposed Plan Sale Of Substantially All Of The Debtors' Assets**

14.     The Debtors have negotiated the primary economic terms of an Asset Purchase Agreement (the "Stalking Horse Agreement")[1] with the Stalking Horse for the sale (the "Plan Sale") of substantially all of the Debtors' assets pursuant to the Debtors' Joint Chapter 11 Plan

---

[1] The Debtors will supplement this Motion by filing a copy of the Stalking Horse Agreement as soon as practicable and before the Court enters an Order granting the Motion.  Until the Stalking Horse Agreement has been executed by the Debtors and the Stalking Horse, the terms of the Stalking Horse Agreement identified herein are subject to further negotiation and modification.  In the event of any conflict between the descriptions set forth herein and the terms and conditions of the Stalking Horse Agreement or the Plan, as the case may be, the terms and conditions of the Stalking Horse Agreement or the Plan, as applicable, shall prevail.

LEGAL18387840.3

(the "Plan"),[2] which is being filed contemporaneously herewith.  Under the Stalking Horse Agreement and Plan, as applicable, the Debtors' estates will be substantively consolidated and the Stalking Horse will pay to the Debtors' estates a cash purchase price of $47,500,000 (the "Purchase Price"), plus any additional sums to be paid by the Stalking Horse pursuant to the Stalking Horse Agreement, by adjustment or otherwise, minus any credits the Stalking Horse is entitled to under the Stalking Horse Agreement, by adjustment or otherwise (collectively, the "Sale Proceeds").  The Debtors further anticipate that they will have cash totaling approximately $1,480,000 on hand as of the effective date of the Plan that will have been escrowed by the Debtors for the payment of real estate taxes (the "Real Estate Tax Reserve"), plus an additional $2,300,000 of cash as of the effective date of the Plan, which amount is net of all real estate taxes accrued up to that date to be paid from such cash (the "Cash on Hand").[3]

15.    The Stalking Horse Agreement contains a due diligence period that will terminate 30 days following the entry of a final, non-appealable Court order granting this Motion and approving the Bid Procedures (as hereinafter defined).  To the extent the Stalking Horse elects to terminate the Stalking Horse Agreement within the due diligence period provided therein, the Stalking Horse shall have no further rights or obligations under the Stalking Horse Agreement, the Plan, or otherwise.  Moreover, pursuant to the Stalking Horse Agreement, the Debtors are required to: (a) obtain a final, non-appealable Court order approving this Motion and the Bid Procedures (defined below) on or before August 31, 2010; (b) obtain a final, non-appealable Court order approving a disclosure statement on or before October 11, 2010; (c) obtain a final, non-appealable Court order confirming the Plan on or before December 16, 2010; and (d) cause

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan.

[3]  The Real Estate Tax Reserve and Cash on Hand estimates are based upon a presumed November 1, 2010 Plan effective date.

-8-

the effective date of the Plan to occur on or before December 31, 2010. Should the Debtors not meet any one or more of the foregoing deadlines, the Stalking Horse shall have the right to terminate the Stalking Horse Agreement without any liability.

16.    As set forth in more detail in the Plan: (a) the Sale Proceeds will first be used to satisfy in full all costs of sale, including, without limitation, FBR's allowed administrative expense claim, with the balance of the Sale Proceeds distributed to the Lender on account of its secured claim; (b) cash in the Real Estate Tax Reserve will be used to satisfy the Debtors' real estate taxes; and (c) Cash on Hand (excluding funds in the Real Estate Tax Reserve) will be used to pay in full all administrative expense claims (other than FBR's claim), any miscellaneous secured claims, any priority tax claims, any miscellaneous priority claims, any monetary cure costs required to be paid by the Debtors as a result of the assumption or assumption and assignment of any executory contracts or unexpired leases by the Debtors and real estate tax claims (only if the Real Estate Tax Reserve is insufficient), with the balance of such Cash on Hand (excluding funds in the Real Estate Tax Reserve) to be distributed to the Lender on account of its secured claim. The Stalking Horse Agreement and Plan further provide that the Stalking Horse will pay to the liquidating trust 20% of Creditor Profit Sharing Income (as defined in the Plan), if any, for the three Operating Years (as defined in the Plan) following the effective date of the Plan, of which 15% shall be distributed pro rata to the Debtors' general unsecured creditors and of which 5% shall be distributed to the Lender on account of its unsecured deficiency claim; provided, however that in no event shall the total amount of such funds to be made available by the Stalking Horse for distribution to the Debtors' general unsecured creditors only (and not on account of the Lender's unsecured deficiency claim) total less than $150,000 in the aggregate (all as set forth in more detail in the Plan).

Case 09-30047   Doc 206   Filed 06/04/10   Entered 06/04/10 16:32:32   Desc Main
Document   Page 10 of 32

17.     FBR procured the Stalking Horse's offer for the purchase of substantially all of the Debtors' assets after more than five months of extensive marketing and solicitation.  The Debtors have concluded, in their business judgment, that the Stalking Horse Agreement represents the highest and best proposal received by the Debtors for their assets to date.  The Debtors therefore believe that the value they will realize from the Stalking Horse Agreement constitutes fair market value for their assets and will support a confirmable Plan that will maximize value to their various creditor constituencies and bring a successful conclusion to these Chapter 11 Cases.  Nevertheless, the Debtors' business and assets will be subject to a continued marketing effort and the Stalking Horse bid will be subject to higher or better offers.  Accordingly, the Debtors are prepared to proceed with the sale of their business and assets under the terms of the Stalking Horse Agreement and the Plan, subject to higher and better bids in accordance with the procedures proposed in this Motion.

## **RELIEF REQUESTED**

18.     By this Motion, the Debtors request the entry of an order (the "Bid Procedures Order") substantially in the form attached hereto as Exhibit A:  (A) approving Bid Procedures (as defined below) for the Plan Sale; (B) scheduling an auction (the "Auction"); (C) approving assumption and assignment procedures (the "Assumption and Assignment Procedures"); (D) approving the form of notice; and (E) granting related relief.

19.     The Plan Sale to the qualified bidders with the highest or otherwise best bids at the Auction (a "Successful Bidder") will maximize the value of the Debtors' estates for the benefit of all of the Debtors' stakeholders, will fund and implement the Plan under section 1129 of the Bankruptcy Code, and, accordingly, is in the best interests of the Debtors, their creditors, and their estates.  Therefore, the Court should grant the relief requested herein.

LEGAL18387840.3

## THE PROPOSED BID AND ASSUMPTION AND ASSIGNMENT PROCEDURES

**A.     The Proposed Bid Procedures**

20.     The following proposed procedures (the "Bid Procedures"), which are also attached as Addendum 1 to the proposed Bid Procedures Order,[4] describe the general process the Debtors anticipate employing to govern the Plan Sale of substantially all of their assets, as such assets are more particularly described and identified in the Stalking Horse Agreement (collectively, the "Assets").

   a.     **The Assets.** The Debtors are offering the Assets for sale pursuant to the Plan, which includes the Real Property.  The Assets will be sold as a single lot or two separate lots, which separate lots shall consist of the Hotel and the Parking Land.  The Debtors shall retain all rights and title to their assets that are not subject to any bid(s) accepted by the Debtors and approved by the Bankruptcy Court at the Confirmation Hearing (defined below).

   b.     **The Bidding Process.** The Debtors shall in their sole discretion, but after consultation with their advisors and the Lender:  (i) determine whether any person is a Potential Bidder (hereinafter defined); (ii) coordinate the efforts of Potential Bidders in conducting their respective due diligence investigations regarding the Debtors' business and assets; (iii) receive offers from Qualified Bidders (hereinafter defined); and (iv) negotiate any offer made to purchase the Assets (collectively, the "Bidding Process"). Neither the Debtors nor their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Assets to any person who is not a Potential Bidder.

   c.     **Participation Requirements**.   Unless otherwise ordered by the Bankruptcy Court, for cause shown, or as otherwise determined by the Debtors in their sole discretion, but after consultation with the Lender, in order to participate in the Bidding Process each person (a "Qualified Bidder") must submit a bid that adheres to the following requirements (a "Qualified Bid"):

      i.     All bids must be submitted to Kevin Phillips and Jim O'Brien of FBR Capital Markets & Co., 237 Park Avenue, 19th Floor, New York, New York 10017, with copies to

---

[4] To the extent the description of the Bid Procedures set forth herein differs from those set forth in Addendum 1 to the Bid Procedures Order, the terms of Addendum 1 to the Bid Procedures Order shall control.

David M. Neff, Perkins Coie LLP, 131 S. Dearborn St., Ste. 1700, Chicago, Illinois 60603, not later than 5:00 p.m. (prevailing Chicago Time) on or before _____, 2010 (the "Bid Deadline"). The Debtors shall immediately distribute by facsimile transmission or electronic mail a copy of each bid received to counsel for the Lender.

ii.   All bids shall be in the form of an offer letter from a person or persons that the Debtors in their sole discretion, but after consultation with the Lender, deem financially able to consummate the purchase of the Assets, which letter states:

(A)   that such Qualified Bidder offers to purchase the Assets -- or only the Hotel or Parking Land, as applicable -- upon the terms and conditions set forth in an executed asset purchase agreement (hard copy and an electronic version in Word format and blacklined against the Stalking Horse Agreement), together with its exhibits and schedules, including terms relating to the proposed purchase price and the time of closing (the "Proposed Agreement");

(B)   that such Qualified Bidder is prepared to consummate the transaction on or before ___ _____, 2010, following the Court's entry of an order confirming the Plan and approving the Plan Sale to the Successful Bidder (the "Confirmation Order");

(C)   that such Qualified Bidder's offer is irrevocable until the earlier to occur of _____, 2010 or two (2) business days after the closing of the Plan Sale of the Assets; and

(D)   which of the Debtors' unexpired leases and executory contracts are to be assumed in connection with the consummation of the Qualified Bidder's bid.

iii.   All bids shall be accompanied by a cash deposit into escrow with the Debtors of an amount equal to five percent (5%) of such bidder's proposed purchase price (the "Good Faith Deposit").

iv.   All bids shall be accompanied by satisfactory evidence, in the sole opinion of the Debtors, but after consultation with the Lender, of committed financing or other ability to

-12-

perform all transactions contemplated by the Proposed Agreement.

v.     All bids must provide for funding of all payments required under the Plan to be funded by the purchaser.

vi.     All bids must identify the proposed management company for the Hotel, if applicable.

vii.     All bids must identify the proposed brand for the Hotel if other than Radisson, if applicable.

viii.     Bids cannot contain any financing conditions or contingencies (other than those set forth in the Stalking Horse Agreement).

ix.     All bids must include information sufficient to determine whether the Potential Bidder can provide adequate assurance of future performance to counterparties to any executory contracts and unexpired leases to be assumed by the Potential Bidder.

d.     **Due Diligence**. The Debtors and FBR, as applicable, shall afford each Potential Bidder (hereinafter defined) due diligence access to the Assets. Due diligence access may include management presentations as may be scheduled by the Debtors, access to data rooms, on site inspections and such other matters which a Potential Bidder may request and as to which the Debtors, in their sole discretion, but after consultation with the Lender, may agree. Neither the Debtors nor any of their affiliates (nor any of their respective representatives) are obligated to furnish any information relating to the Assets to any person except to Potential Bidders. Potential Bidders are advised to exercise their own discretion before relying on any information regarding the Assets provided by anyone other than the Debtors or their representatives. To be a "Potential Bidder," each bidder must have delivered the following:

i.     an executed confidentiality agreement in form and substance satisfactory to the Debtors; and

ii.     current audited and unaudited financial statements or other financial information of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets, current audited and unaudited financial statements or other financial information of the Potential Bidder's equity holder or other financial backer, or such other form of financial disclosure and evidence acceptable to the Debtors and their advisors in their sole discretion, demonstrating such Potential Bidder's ability to

-13-

close the proposed transaction, to fund the Plan, to finance going concern operations, and to provide adequate assurance of future performance to counterparties to any executory contracts and unexpired leases to be assumed by the Potential Bidder.

e.   **"As Is, Where Is**." The sale of the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their agents or estates, except to the extent set forth in the Proposed Agreement of the Successful Bidder.  Except as otherwise provided in the Proposed Agreement, all of the Debtors' right, title and interest in and to the Assets to be acquired shall be sold pursuant to the Plan free and clear of all liens, claims, charges, security interests, restrictions and other encumbrances of any kind or nature thereon and there against (collectively, the "Transferred Liens"), with such Transferred Liens to be satisfied in accordance with the Plan.  Each bidder shall be deemed to acknowledge and represent that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or Assets in making its bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any information provided in connection with the Assets, the Bidding Process or the Auction, except as expressly stated in these Bid Procedures or, as to the Successful Bidder, in the applicable Proposed Agreement.

f.   **Stalking Horse**.   The Stalking Horse has submitted a Qualified Bid pursuant to the Stalking Horse Agreement, which Qualified Bid shall serve as a stalking horse bid (the "Stalking Horse Bid").

g.   **Stalking Horse Bid Protections:**   The Debtors hereby seek court authority for, and pursuant to such order would be required to:  (i) either (x) provide a $1,425,000 break-up fee to the Stalking Horse, payable only in the event that an alternative transaction for the Assets closes and the Stalking Horse is not the Successful Bidder at the Auction, or (y) reimburse the Stalking Horse for its actual out of pocket expenses, including reasonable attorneys' fees and disbursements, up to a maximum of $250,000, payable only in the event that the Stalking Horse is the Successful Bidder and the Effective Date of the Plan shall not have occurred on or before December 31, 2010 or the Stalking Horse is otherwise entitled to terminate the Stalking Horse Agreement in accordance with the terms thereof before or after the Auction, other than pursuant to the due diligence termination right;[5] and (ii) provide that any

---

[5]   The Stalking Horse may terminate the Stalking Horse Agreement if, among other things, the deadlines for entry of orders approving the disclosure statement and confirming the Plan are not met, the Lenders

initial competing Qualified Bids for the Assets must exceed the aggregate consideration to be paid to or for the benefit of the Debtors' estates as set forth in the Stalking Horse Bid by at least $1,675,000.

h.   **Credit Bid**:  The Plan Sale is being conducted under sections 1123(a) and (b) and 1129(b)(2)(A)(iii) of the Bankruptcy Code, and not section 363 of the Bankruptcy Code.  As such, no holder of a lien on any assets of the Debtors shall be permitted to credit bid pursuant to section 363(k) of the Bankruptcy Code.

i.   **Auction.**  If the Debtors receive more than one Qualified Bid prior to the Bid Deadline, the Debtors shall conduct an auction (the "Auction") at the offices of Perkins Coie LLP, 131 S. Dearborn St., Ste. 1700, Chicago, IL 60603, on _____, 2010, beginning at __ a.m.  (prevailing   Chicago Time) or such later time or other place as the Debtors shall notify all Qualified Bidders who have submitted Qualified Bids.  The Debtors may announce at the Auction additional procedural rules that are reasonable under the circumstances (*e.g.*, the amount of time allotted to make subsequent overbids) for conducting the Auction, so long as such rules are not inconsistent with these Bid Procedures.  Based upon the terms of the Qualified Bids received, the number of Qualified Bidders participating in the Auction, and such other information as the Debtors determine is relevant, the Debtors, in their sole discretion, may conduct the Auction in the manner they determine will achieve the maximum value for the Assets.

At the Auction, the minimum initial bid against the Stalking Horse Bid for the Assets in a single lot must exceed the value of the Stalking Horse Bid by $1,675,000.  If bids are received for the purchase of just the Hotel and/or the Parking Land, the highest bids for the Hotel and the Parking Land combined must exceed the value of the Stalking Horse Bid by at least $1,675,000.  If the highest bids received for the Hotel and the Parking Land combined do not exceed the value of the Stalking Horse Bid by at least $1,675,000, (i) those bidders that have bid on only the Hotel and/or the Parking Land shall not be deemed to be Qualified Bidders and shall not be permitted to participate in the Auction and (ii) the Auction shall proceed only with respect to the Assets in a single lot, if at all.  Subsequent overbids, whether for the Assets in a single lot or for just the Hotel or Parking Land, shall be made in minimum increments of $250,000.

As soon as practicable after the conclusion of the Auction, the Debtors, in their sole discretion, but after consultation with the Lender, shall: (i) review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors

---

obtain relief from the automatic stay or if any Court order granting this Motion and approving the Bid Procedures is modified, vacated or reversed in whole or in part.

LEGAL18387840.3

affecting the speed and certainty of consummating the Plan Sale and confirming the Plan; and (ii) identify the highest or otherwise best offer(s) for the Assets (a "Successful Bid") and any second-highest offer(s).  The Debtors will present the Successful Bid(s) to the Bankruptcy Court for approval at the Confirmation Hearing.  The Debtors reserve all rights to not submit any bid which is not acceptable to the Debtors in their sole discretion, but after consultation with the Lender.

j.  **Acceptance of Qualified Bids**.  The Debtors shall sell the Assets to the Stalking Horse or the Successful Bidder(s), as the case may be, submitting the highest or otherwise best Qualified Bid(s) at the Auction, after confirmation of the Plan and approval of such Qualified Bid(s) by the Bankruptcy Court at the Confirmation Hearing and upon the Plan's effective date.  The Debtors' presentation to the Bankruptcy Court for approval of a particular Qualified Bid does not constitute the Debtors' acceptance of such Qualified Bid.  The Debtors shall have accepted a Qualified Bid only when that Qualified Bid has been approved by the Bankruptcy Court at the Confirmation Hearing.

k.  **The Confirmation Hearing**.  After the conclusion of the Auction and the solicitation of the Plan, the Bankruptcy Court shall conduct a hearing (the "Confirmation Hearing") to confirm the Plan and approve the Plan Sale.  At the Confirmation Hearing, the Debtors will seek entry of an order (the "Confirmation Order"), among other things:  (i) confirming the Plan; (ii) authorizing and approving the Plan Sale to the Successful Bidder(s), as determined by the Debtors in accordance with the Bid Procedures, pursuant to the terms and conditions set forth in the Proposed Agreement(s) submitted by the Successful Bidder(s) (as such agreement(s) may be modified prior to, during or after the Auction with the agreement of the Debtors); and (iii) exempting the sale and conveyance of the Assets from any transfer tax, stamp tax or similar tax pursuant to section 1146(c) of the Bankruptcy Code.  The Confirmation Hearing may be adjourned or rescheduled without notice other than by an announcement of the adjourned date in open court.

Following the entry of the Confirmation Order approving the Plan Sale, if a Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the next highest or otherwise best Qualified Bid, as disclosed at the Confirmation Hearing, shall be deemed to be the Successful Bid and the Debtors shall be authorized to effectuate such sale without further order of the Bankruptcy Court.

l.  **Return of Good Faith Deposit.**  The Good Faith Deposits of all Qualified Bidders shall be retained by the Debtors and all Qualified Bids will remain open and irrevocable, notwithstanding Bankruptcy Court approval of a sale pursuant to the terms of a Successful Bid by a Qualified Bidder, until

the earlier to occur of _____, 2010 or two (2) business days after the closing of the Plan Sale of the Assets. If a Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Debtors will not have any obligation to return the Good Faith Deposit deposited by such Successful Bidder, which shall be retained by the Debtors as liquidated damages.

m.   **Modifications.**   The Debtors may, in their sole discretion, but after consultation with the Lender: (i) determine, in their business judgment, which Qualified Bid(s), if any, constitute the highest or otherwise best offer for the Assets; (ii) consult with the representatives of the Lender or other significant constituent in connection with the Bidding Process and Bid Procedures; and (iii) reject at any time before entry of the Confirmation Order approving a Qualified Bid, any bid that, in the Debtors' sole discretion, but after consultation with the Lender, is: (x) inadequate or insufficient; (y) not in conformity with the requirements of the Plan, the Bankruptcy Code, the Bid Procedures, or the terms and conditions of sale; or (z) contrary to the best interests of the Debtors, their estates, their creditors and other parties in interest. At or before the Confirmation Hearing, the Bankruptcy Court, or, consistent with the purposes of the Bid Procedures to obtain the highest or otherwise best offer(s) for the Assets, the Debtors may, in their sole discretion, but after consultation with the Lender, impose such other terms and conditions as it or they may determine to be in the best interests of the Debtors' estates, their creditors and other parties in interest.

n.   **Reservation of Rights:**   In addition to their rights set forth in sections (i) and (m) above, the Debtors may, in their sole discretion, but after consultation with the Lender, modify these Bid Procedures or impose, at or prior to the Auction, additional terms and conditions on the proposed Sale of the Assets if, in their reasonable judgment, such modifications would be in the best interests of the Debtors' estates and promote an open and fair sale process.

## B.   The Proposed Assumption and Assignment Procedures

21.   To implement the Plan Sale of the Debtors' Assets to the Successful Bidder(s), the Debtors seek authorization to assume and assign certain contracts and unexpired leases in connection with the Plan Sale. To provide counterparties with adequate notice of such assumption and proposed adequate cure amounts (the "Cure Amounts"), the Debtors propose the

LEGAL18387840.3

following procedures (the "Assumption and Assignment Procedures"), which also are attached as

Addendum 2[6] to the proposed Bid Procedures Order:

<ol type="a">
<li>Within five (5) days prior to the Bid Deadline, the Debtors shall file a schedule of cure obligations (the "Contract and Cure Schedule") listing all unexpired leases and executory contracts that the Stalking Horse intends to assume (the "Assigned Contracts") and the amount, if any, that the Debtors contend is the amount needed to pay to cure any defaults with respect to such Assigned Contracts (the "Cure Amounts").</li>

<li>Upon such filing, a copy of the Contract and Cure Schedule and these Assumption and Assignment Procedures shall be served on each of the counterparties to the Assigned Contracts listed on the Contract and Cure Schedule.</li>

<li>The Debtors shall amend the Contract and Cure Schedule promptly after the completion of the Auction to update the information contained therein with respect to the Successful Bid, and shall serve an amended Contract and Cure Schedule on each of the counterparties to the Assigned Contracts listed thereon.</li>

<li>Any objections ("Assignment Objections") to the assumption and assignment of any Assigned Contract, including, but not limited to, objections relating to adequate assurance of future performance or to the cure amount set forth in the Contract and Cure Schedule must be filed with the Bankruptcy Court and served upon the Debtors' counsel on or before 4:00 p.m. (prevailing Chicago Time) on the second business day before the Confirmation Hearing (the "Assignment Objection Deadline").</li>

<li>Any counterparty failing to file an Assignment Objection by the Assignment Objection Deadline shall be forever barred from: (i) objecting to the Cure Amount set forth on the Contract and Cure Schedule with respect to its Assigned Contract; (ii) seeking additional amounts arising under its Assigned Contract prior to the closing on the Plan Sale from the Debtors or the Successful Bidder; and (iii) objecting to the assumption and assignment of its Assigned Contract to the Successful Bidder.</li>

<li>Any Assignment Objections not consensually resolved prior to the Confirmation Hearing shall be heard at the Confirmation Hearing with any related Cure Amounts or adequate assurance of future performance being fixed by the Bankruptcy Court.   All other objections to the proposed</li>
</ol>

---

[6] To the extent the description of the Assumption and Assignment Procedures set forth herein differs from those set forth in Addendum 2 to the Bid Procedures Order, the terms of Addendum 2 to the Bid Procedures Order shall control.

assumption and assignment of the Assigned Contracts will be heard at the Confirmation Hearing.

g.    Except as may otherwise be agreed to by all parties to an Assigned Contract, on or before the Closing, the cure of any defaults under Assigned Contracts necessary to permit assumption and assignment thereof shall be by:  (i) payment of the undisputed Cure Amount; and/or (ii) establishment of a reserve with respect to any disputed Cure Amount in an amount established by the Bankruptcy Court.  Cure Amounts shall be paid by the Debtors from the Debtors' cash on hand.

22.    The Debtors believe that the proposed Assumption and Assignment Procedures will provide the counterparties to the Assigned Contracts a full and fair opportunity to be heard with respect to issues concerning Cure Amounts and the proposed assumption and assignment of the Assigned Contracts.

## BASES FOR RELIEF REQUESTED

### A.    Secured Creditors Do Not Have An Absolute Right To Credit Bid

23.    The proposed Bid Procedures preclude secured creditors from submitting credit bids for the Assets pursuant to the Plan Sale.  Precluding credit bidding is appropriate and permissible under the Bankruptcy Code in the context of the Plan Sale, as opposed to a sale outside the ordinary course of business under section 363(b) of the Bankruptcy Code.

24.    The Bankruptcy Code provides two methods by which a debtor may sell substantially all of its assets.  The first is a sale conducted pursuant to section 363(b) of the Bankruptcy Code.  The second is a sale pursuant to a plan.  *See* 11 U.S.C. § 1123(b) ("Subject to subsection (a) of this section, a plan may - … (4) provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests…").  Unless the court for cause orders otherwise, secured creditors are permitted to submit credit bids when a debtor sells its assets pursuant to section 363(b) of the Bankruptcy Code.  *See* 11 U.S.C. § 363(k) ("At a sale under subsection (b) of this section . . .

unless the court for cause orders otherwise the holder of [a secured claim] may bid at such

sale . . .").

25.     Unlike section 363(b) sales, the right to credit bid is not expressly granted to

secured creditors when a debtor sells substantially all of its assets pursuant to a plan.  For

example, to be fair and equitable with respect to a class of impaired secured claims, a plan must

provide:

> "(i) that the holders of [secured claims] retain the liens securing such claims . . .
> and . . . that each holder of a [secured claim] receives on account of such claim
> deferred cash payments totaling at least the allowed amount of such claim . . .;
>
> (ii) for the sale, subject to section 363(k) of this title, of any property that is
> subject to the liens securing [the secured claims] . . . with such liens to attach to
> the proceeds of such sale . . .; or
>
> (iii) for the realization by such holders of the indubitable equivalent of [the
> secured claims].

11 U.S.C. § 1129(b)(2)(A).  Though subsection (ii) provides a secured creditor with the right to

credit bid if a debtor seeks confirmation under that subsection, sections 1129(b)(2)(A)(ii) and

(iii) are to be read in the disjunctive and a debtor may seek to confirm its plan under subsection

(iii) without providing a right to credit bid pursuant to a plan sale.  *See id.*

26.     Case law also supports the proposition that secured creditors do not have an

absolute right to credit bid at a sale under a plan.  *See In re Philadelphia Newspapers, LLC*, 599

F.3d 298 (3d Cir. 2010); *In re The Pacific Lumber Co.*, 584 F.3d 229 (5th Cir. 2009); *In re

CRIIMI MAE, Inc.*, 251 B.R. 796 (Bankr. D. Md. 2000).  The United States Courts of Appeals

for both the Fifth and Third Circuits have concluded that a secured creditor does not have an

absolute right to credit bid if the debtor proposes to sell its assets pursuant to a plan and pursues

plan confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code.  *See Philadelphia

Newspapers*, 599 F.3d at 312 (holding that "a debtor may proceed with a sale under subsection

-20-

(iii) without permitting secured lenders to credit bid."); *Pacific Lumber*, 584 F.3d at 246 (recognizing that "[a]lthough a credit bid option might render Clause (ii) imperative in some cases, it is unnecessary here because the plan offered a cash payment to the Noteholders. Clause (iii) thus affords a distinct basis for confirming a plan if it offered the Noteholders the 'realization . . . of the indubitable equivalent of such claims.'"); *see also CRIIMI MAE*, 251 B.R. at 806-07 (holding that a plan may be confirmed by satisfying section 1129(b)(2)(A)(iii) without providing a secured creditor the right to credit bid).

27.    Here, the Debtors are proposing to sell their Assets pursuant to the Plan and seek confirmation of the Plan under section 1129(b)(2)(A)(iii) of the Bankruptcy Code.  Indeed, the Debtors believe that the Lender will realize the indubitable equivalent of its secured claim under the Plan as required by section 1129(b)(2)(A)(iii) of the Bankruptcy Code.  Thus, based upon the plain language of the Bankruptcy Code and established case law, the Debtors' secured creditors should be precluded from submitting credit bids for the purchase of the Debtors' Assets.

**B.    The Debtors' Secured Creditors Should Be Precluded From Submitting Credit Bids For Cause**

28.    Even if the Court rejects the Debtors' request to preclude credit bidding under section 1129(b)(2)(A)(iii) of the Bankruptcy Code, the Debtors' secured creditors should nevertheless be precluded from submitting credit bids for cause.  As set forth above, secured creditors may submit credit bids in connection with section 363(b) sales "unless the court for cause orders otherwise."  11 U.S.C. § 363(k).  Courts have discretion to deny credit bidding and though "cause" is not defined by the Bankruptcy Code, "it is intended to be a flexible concept enabling a court to fashion an appropriate remedy on a case-by-case basis."  *In re NJ Affordable Homes Corp.*, 2006 WL 2128624, *16 (Bankr. D. N.J. June 29, 2006).

LEGAL18387840.3

29.     As set forth above, the Lender precipitated the Debtors' Chapter 11 Cases by improperly terminating the Debtors' funding under the Loan.  The Lender was at all times aware of the increased budget for the construction of the larger parking structure and expressly approved and funded construction draw requests throughout the course of the Loan until the Lender (or at least SDNB) apparently began experiencing its own financial difficulty, at which time the Lender alleged a default on the part of the Debtors to terminate all funding under the Loan.  As a result: (a) the Debtors and their assets have been exposed to mechanic's lien claims in excess of $15,000,000; (b) Gateway Deck has been unable to complete and sell its parking structure to at least partially repay the Lender; (c) the Debtors have been forced to engage in the Enterprise Litigation, which has been and will likely continue to be costly and which could jeopardize the Debtors' Chapter 11 Cases; and (d) the Hotel's ability to adequately service group business bookings has been impaired due to the resulting lack of on-site parking and the Hotel's ability to operate parking operations profitably has been rendered impossible due to the costs of obtaining off-site parking.  Had the Lender not terminated the Debtors' funding, Gateway Deck could have at least partially repaid the Lender by now as a result of the sale of its parking structure.  Instead, the Lender has substantially impaired and delayed its own ability to realize any value from the disposition of the Debtors' Assets.  It would therefore be unjust to permit the Lender to acquire the Assets pursuant to a credit bid based on its prior conduct.

30.     Furthermore, U.S. Bank, which has succeeded to all of SDNB's rights and obligations under the Loan pursuant to the SDNB Agreement, will be compensated by the FDIC for most of the losses it sustains in connection with the Loan.  Thus, any policy considerations that might support credit bidding on the part of secured creditors do not apply in U.S. Bank's case.  To the contrary, U.S. Bank should have no incentive to acquire an ownership interest in

the Assets through a credit bid but, rather, be motivated to achieve the highest and best price for

the Assets pursuant to the fair and open sale process contemplated by the Debtors.

31.     In addition, granting an undersecured creditor the right to credit bid may result in

chilling the bidding process because potential bidders may not be willing to devote the time and

resources necessary to conduct due diligence if an undersecured creditor is able to dominate the

process by bidding the full amount of its secured and unsecured claims.  *See e.g.*, 3 COLLIER ON

BANKRUPTCY ¶ 363.09[1] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.) ("The court

might [deny credit bidding if] permitting the lienholder to bid would chill the bidding process.").

Here, the Lender's claim far exceeds the Purchase Price under the Stalking Horse Agreement.

Therefore, if the Lender is permitted to credit bid, additional potential bidders may be dissuaded

from participating in the Plan Sale if the Lender can bid the full amount of its claim.

32.     Moreover, if the Lender is permitted to credit bid at the Plan Sale, the Stalking

Horse has informed the Debtors that it will not proceed with the Stalking Horse Agreement,

thereby jeopardizing the Debtors' ability to make a distribution to all of their creditors pursuant

to the terms of the Plan.  Thus, not only would precluding credit bidding constitute the correct

result, but also it is the fair result.  If the Lender, or any other secured creditors for that matter,

wants to acquire the Assets, it should do so by participating in the Auction and paying cash for

the Assets just the same as the Stalking Horse is prepared to do.  Indeed, that is exactly what the

lenders successfully did in the *Philadelphia Newspapers* case.  Therefore, the Court should

preclude all of the Debtors' secured creditors from submitting credit bids in connection with the

Plan Sale for cause under section 363(k) of the Bankruptcy Code.

**C.      The Court Should Approve the Bid Procedures**

33.     The Debtors' business judgment is entitled to substantial deference with respect to

the procedures to be used in selling assets from the estate.  *See*, *e.g.*, *In re Integrated Res., Inc.*,

-23-

147 B.R. 650, 656-57 (S.D.N.Y. 1992) (noting that overbid procedures and break-up fee arrangements that have been negotiated by a debtor are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid"); *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (same).

34.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See, e.g., Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand); *Integrated Res.*, 147 B.R. at 659 ("'It is a well-established principle of bankruptcy law that the … [Debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.'") (quoting *Cello Bay Co. v. Champion Int'l Corn. (In re Atlanta Packaging Prods., Inc.)*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988)).  Thus, courts recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales.  *See, e.g., Integrated Res.*, 147 B.R. at 659 (such procedures "encourage bidding and maximize the value of the debtor's assets").

35.     The Debtors submit that the proposed Bid Procedures are appropriate under the circumstances, including (a) the proposed break-up fee in the amount of $1,425,000 to be paid to the Stalking Horse in the event the Debtors close on the sale of the Assets to a purchaser other than the Stalking Horse (the "Break-Up Fee") or (b) reimbursement of the Stalking Horse's actual out of pocket expenses, including reasonable attorneys' fees and disbursements, up to a maximum of $250,000, payable in the event that the Effective Date of the Plan shall not have

occurred on or before December 31, 2010 or the Stalking Horse is otherwise entitled to terminate

the Stalking Horse Agreement in accordance with the terms thereof, other than pursuant to the

due diligence termination right (the "Expense Reimbursement").  For example, the Break-Up Fee

totals only three percent (3%) of the Purchase Price under the Stalking Horse Agreement, which

is reasonable and customary in this jurisdiction, and it will not be paid to the Stalking Horse

unless the Debtors accept and close on a higher and better offer for the Assets.  Because any

initial competing bids for the Assets must, among other things, total at least the purchase price

under the Stalking Horse Agreement, plus the amount of the Break-Up Fee and a $250,000

overbid, payment of the Break-Up Fee will not diminish the Debtors' estate.  Moreover, the

Expense Reimbursement is fair and will not be paid in addition to the Break-Up Fee, but only as

an alternative to the Break-Up Fee in the event that (x) the Stalking Horse incurs actual out of

pocket costs conducting due diligence and otherwise pursuing the purchase of the Assets and

(y) among other things, the Debtors are unable to meet the deadlines in the Stalking Horse

Agreement or confirm the Plan, or the Stalking Horse is entitled to terminate the Stalking Horse

Agreement in accordance with the terms thereof before or after the Auction, other than pursuant

to the Stalking Horse's termination right during its due diligence period.

36.    The Bid Procedures, including, without limitation, the Break-Up Fee, the Expense

Reimbursement, and the inability of secured creditors to credit bid, are all necessary to provide

the Stalking Horse with an incentive for entering into the Stalking Horse Agreement.  In fact,

without these protections, the Stalking Horse would be unwilling to proceed pursuant to the

Stalking Horse Agreement.  The proposed Bid Procedures are therefore reasonable, appropriate,

and within the Debtors' sound business judgment under the circumstances because they will

serve to maximize the value that the Debtors will recover on account of the Plan Sale and they will enable the Debtors to fund and confirm the Plan.

**D.     The Auction, Hearing and Notice Procedures Are Appropriate**

37.     Pursuant to Bankruptcy Rule 2002, the Debtors are required to provide creditors with twenty-one (21) days' notice of the Plan Sale and twenty-five (25) days' notice of the Confirmation Hearing.  Pursuant to Bankruptcy Rule 2002(c), the Debtors are required to notify their creditors of the proposed sale of the Debtors' assets, including a disclosure of the time and place of the Confirmation Hearing, the terms and conditions of the Plan Sale, and the deadline for filing any objections.

38.     The Debtors propose that within seven days following entry of the Bid Procedures Order, the Debtors will distribute a Notice of Sale of Assets in the form of Addendum 3 to the proposed order attached hereto (the "Sale Notice") and the Bid Procedures Order to:  (a) the Office of the United States Trustee; (b) counsel to the Debtors' Lender; (c) those parties that have requested notice of all pleadings in the Debtors' Chapter 11 Cases pursuant to Bankruptcy Rule 2002; and (e) any known prospective bidders and other parties previously contacted by FBR or that have expressed any interest in the Assets to FBR.  In addition, within seven days following entry of the Bid Procedures Order, the Debtors will serve the Sale Notice by first class mail upon all of the Debtors' known creditors.

39.     Further, if the Bankruptcy Court believes it is appropriate, the Debtors will publish an abbreviated version of the Sale Notice at least once in the national edition of The Wall Street Journal and the Los Angeles Times at least twenty days prior to the Auction.  The Debtors contend that such notice of the Auction is good and sufficient notice and that no other or further notice thereof is required.

LEGAL18387840.3

## NOTICE

40.     Notice of this Motion and a copy of this Motion have been served upon: (a) the Office of the United States Trustee; (b) counsel to Lender; (c) the Debtors' 20 largest unsecured creditors; and (d) those parties that have requested notice of all pleadings in the Debtors' Chapter 11 Cases pursuant to Bankruptcy Rule 2002.

41.     The Debtors submit that good and sufficient notice of this Motion has been provided and no other or further notice need be provided.

WHEREFORE, the Debtors respectfully request (a) entry of the Bid Procedures Order, substantially in the form attached hereto as Exhibit A; and (B) such other and further relief as the Court deems just and proper.[7]

Dated:  June 4, 2010              **RADLAX GATEWAY HOTEL, LLC**
                                 **RADLAX GATEWAY DECK, LLC**


                                 By:    /s/ Brian A. Audette
                                       PERKINS COIE LLP
                                       David M. Neff (ARDC # 6190202)
                                       Brian A. Audette (ARDC # 6277056)
                                       Eric E. Walker (ARDC # 6290993)
                                       131 S. Dearborn Street - Suite 1700
                                       Chicago, Illinois 60603-5559
                                       Telephone:  (312) 324-8400
                                       Facsimile:  (312) 324-9400

                                       *Attorneys for the Debtors*

---

[7]  To the extent this Motion is construed as a "brief" under Local Rule 5005-3(C), the Debtors request that the Court waive the 15-page limitation contained in Local Rule 5005-3(C).

LEGAL18387840.3

## <u>CERTIFICATE OF SERVICE</u>

Brian A. Audette, an attorney, hereby certifies that on June 4, 2010 he caused a copy of

the *Notice of Motion* and *Debtors' Motion for an Order:  (A) approving procedures for the sale*

*of substantially all of the Debtors' assets; (B) scheduling an auction; (C) approving assumption*

*and assignment procedures; (D) approving form of notice; and (E) granting related relief* to be

filed via the Court's ECF system and served on the parties listed on the attached Service List, as

so indicated.


                                                                /s/ Brian A. Audette

## MASTER SERVICE LIST – RADLAX GATEWAY HOTEL, LLC

| | Fax No./Email Address | Method of Delivery | | Fax No./Email Address | Method of Delivery |
|---|---|---|---|---|---|
| Steve Wolfe<br>Office of the U.S. Trustee<br>219 S Dearborn St., Room 873<br>Chicago, IL 60604 | steve.g.wolfe@usdoj.gov | Court's ECF notification | Amalgamated Bank<br>c/o Jeffrey Chang<br>John W. Costello<br>Wildman Harrold Allen & Dixon<br>225 W. Wacker Dr., Suite 3000<br>Chicago, IL 60606 | 312.416.4841<br>jchang@wildman.com<br>costello@wildman.com<br>molson@wildman.com | Court's ECF notification |
| San Diego National Bank<br>c/o Forrest B. Lammiman<br>Ann Marie Bredin<br>Meltzer, Purtill & Stelle, LLC<br>300 S. Wacker Dr., Suite 3500<br>Chicago, IL 60606-6704 | 312.987.9854<br>flammiman@mpslaw.com<br>abredin@mpslaw.com | Court's ECF notification | Edward Don & Company<br>c/o Dennis E. Quaid<br>Thompson Coburn LLP<br>55 E. Monroe Street, 37th Fl.<br>Chicago, IL 60603 | 312.782.1315<br>dquaid@tcfhlaw.com | Court's ECF notification |
| Bomel Construction Co. Inc.<br>c/o Lauren Newman<br>Thompson Coburn LLP<br>55 E. Monroe Street, 37th Fl.<br>Chicago, IL 60603 | 312.782.3659<br>lnewman@tcfhlaw.com | Court's ECF notification | Bomel Construction Co. Inc.<br>c/o Benjamin R. Trachtman<br>Trachtman & Trachtman<br>27401 Los Altos, Suite 300<br>Misión Viejo, CA 92691 | 949.282.0111<br>btrachtman@trachtman<br>law.com | U.S. Mail |
| Raymond-Southern California Inc.<br>f/k/a Raymond Interior Systems<br>c/o John J. O'Leary<br>20 S. Clark St., Suite 500<br>Chicago, IL 60603 | 312.372.7076<br>joleary@olearylawfirm.com | Court's ECF notification | US FoodService<br>15155 Northam Street<br>La Mirada, CA 90638 | 714.670.3779 | U.S. Mail |
| Carlson Hotels Worldwide<br>Attn: Legal Dept. - MS8256<br>701 Carlson Parkway<br>Hopkins, MN 55305 | 763.212.1080 | U.S. Mail | Hufcor Airwalls<br>8739 E. Artesia Blvd.<br>Bellflower, CA 90706 | 562.630.8203 | U.S. Mail |

| | Fax No./Email Address | Method of Delivery | | Fax No./Email Address | Method of Delivery |
|---|---|---|---|---|---|
| Radiant Services<br>651 W. Knox Street<br>Gardena, CA 90248 | 310.323.4030 | U.S. Mail | Tidy Building Services<br>609 W. William David Pkwy.<br>Suite 202<br>Metairie, LA 70005 | 504.833.6585 | U.S. Mail |
| R.W. Smith & Co.<br>18511 Broadwick Street<br>Rancho Dominguez, CA 90220 | 858.530.0224 | U.S. Mail | M3, Inc.<br>1414 Fair Oaks Ave., Suite 3<br>South Pasadena, CA 91030 | 626.441.0355 | U.S. Mail |
| PSAV Presentation Services<br>1700 E. Golf Rd., Suite 400<br>Schaumburg, IL 60173 | 847.222.1614 | U.S. Mail | Fehr & Peers Transportation Consulting<br>100 Pringle Ave., Suite 600<br>Walnut Creek, PA 94596 | 925.933.8007 | U.S. Mail |
| M3, Inc.<br>c/o Anthony A. DiMonte<br>Law Offices of Virgil L. Roth<br>625 Fair Oaks Ave., Suite 255<br>South Pasadena, CA 91030 | 626.441.1166 | U.S. Mail | K&M Foodservice<br>2443 East 27th Street<br>Vernon, CA 90058 | 323.582.7401 | U.S. Mail |
| VOA Associates<br>224 S. Michigan, Suite 1400<br>Chicago, IL 60604 | 312.554.1412 | U.S. Mail | Lato Supply<br>3828 W. Whitton Ave.<br>Phoenix, AZ 85019 | 602.269.5892 | U.S. Mail |
| Destination Shuttle Services<br>8939 Sepulveda Blvd.<br>Ste #110-1031<br>Los Angeles, CA 90045 | 310.338.9498 | U.S. Mail | Mark Kitchen Equipment Services<br>824 East Hellman Ave<br>Monterey Park, CA 91755 | 602.269.5892 | U.S. Mail |
| Los Angeles Dept of Water & Power<br>Attn: Legal Dept.<br>111 North Hope Street<br>Los Angeles, CA 90012 | 213.367.1455 | U.S. Mail | West Central Produce<br>2020 E. 7th Place<br>PO Box 21331<br>Los Angeles, CA 90021 | 213.629.3700 | U.S. Mail |

| | Fax No./Email Address | Method of Delivery | | Fax No./Email Address | Method of Delivery |
|---|---|---|---|---|---|
| Excel Elevator Service<br>4444 Union Pacific Ave.<br>Los Angeles, CA 90023 | 323.268.3216 | U.S. Mail | Los Angeles World Airports (LAWA)<br>1 World Way. Room 104<br>Los Angeles, CA 90009-2216 | 310.646.1893 | U.S. Mail |
| Quality Parking Service<br>16101 Ventura Blvd., Suite 315<br>Encino, CA 91436 | 818.382.6690 | U.S. Mail | C.A. O'Reilly & Associates Builders, Inc.<br>c/o Jonathan P. Friedland<br>Levenfeld Pearlstein, LLC<br>2 N. LaSalle St., Suite 1300<br>Chicago, IL 60602 | 312.346.8434<br>jfriedland@oplegal.com | Court's ECF notification |
| Pacific Coast Steel<br>Gerald P. Kennedy<br>c/o Procopio Cory Hargreaves & Savitch LLP<br>530 "B" Street, Suite 2100<br>San Diego, CA 92101 | 619.235.0398<br>gpk@procopio.com | Court's ECF notification | Pacific Coast Steel<br>c/o Rebecca D. Rosenthal<br>Howard L. Adelman<br>Adelman & Gettleman Ltd.<br>53 W. Jackson Blvd., Suite 1050<br>Chicago, IL 60604 | (312) 435-1059<br>rrosenthal@ag-ltd.com<br>hadelman@ag-ltd.com | Court's ECF notification |
| C.A. O'Reilly & Associates Builders<br>c/o Steven W. Weinshenk<br>Timothy W. Hamilton<br>Steven W. Weinshenk, P.C.<br>24005 Venture Boulevard<br>Calabasa, CA 91302 | swlawfirm@swlawfirm.net<br>timothy.l.hamilton@gmail.com | U.S. Mail | Catalina Pacific Concrete<br>c/o Monica C. O'Brien<br>Gregory K. Stern, P.C.<br>53 W. Jackson Blvd., Suite 1442<br>Chicago, IL 60604 | Phone: 312.427.1558<br>Gstern1@flash.net | Court's ECF notification |
| LAX Enterprise, LP<br>c/o Ryan Schultz<br>N. Neville Reid<br>Elizabeth Peterson<br>Fox Hefter Swibel Levin and Carroll<br>200 W. Madison St., Suite 3000<br>Chicago, IL 60606 | Phone:  312.224.1200<br>rschultz@fhslc.com<br>epeterson@fhslc.com | Court's ECF notification | Stress Express Inc.<br>c/o John V. Del Gaudio, Jr.<br>John V. Del Gaudio, Jr., Ltd.<br>4620 N. Racine Ave., Suite 9<br>Chicago, IL 60640 | 312.528.9499<br>jvd@jvdlaw.com | Court's ECF notification |

| | Fax No./Email Address | Method of Delivery | | Fax No./Email Address | Method of Delivery |
|---|---|---|---|---|---|
| Frank S. Smith, Masonry, Inc.<br>c/o Derek L. Wright<br>Foley & Lardner LLP<br>321 N. Clark St., Suite 2800<br>Chicago, IL 60654 | dlwright@foley.com | Court's ECF notification | Apollo Electric, Inc.<br>c/o David T. Ward<br>Hallstrom Klein & Ward<br>15615 Alton Pkwy., Suite 175<br>Irvine, CA 92618 | 949.450.1588<br>David@HKWLLP.com | U.S. Mail |
| Cattrac Construction, Inc.<br>Stephanie Jacinto, President<br>15030 Slover Avenue<br>Fontana, CA 92337 | 909.355.4833 | U.S. Mail | Gary Redcher Plumbing dba<br>George Kaufman Plumbing<br>c/o Steven L. Bergh<br>Prenovost Normandin Bergh<br>  & Dawe<br>2122 N. Broadway, Suite 200<br>Santa Ana, CA 92706-2614 | 714.835.2889<br>sbergh@pnbd.com | U.S. Mail |
| Western States Fire Protection Co.<br>c/o L. Judson Todhunter<br>Howard & Howard Attorneys PLLC<br>200 S. Michigan Ave., Suite 1100<br>Chicago, IL 60604 | 312.372.4000<br>jtodhunter@howardandhoward.com | Court's ECF notification | | | |

LEGAL18387840.3